UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| JET PARTS ENGINEERING, INC., | ) | CASE NO. C15-0530 RSM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING IN PART AND |
| v. | ) | DENYING IN PART DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT |
| QUEST AVIATION SUPPLY, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## I.      INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment. Dkt. #52.  Defendants ask the Court to dismiss all of Plaintiff's claims on the basis that it cannot meet the elements of its claims on the facts in this record.  *Id.*  Plaintiff opposes summary judgment, arguing that disputes of material fact require this Court to allow a jury to decide the claims. Dkt. #69-1.  For the reasons discussed herein, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment.[1]

---

[1]  In reviewing this motion, the Court utilized the publically-filed briefs and exhibits, as well as the unredacted briefs and exhibits filed under seal.  In this Order, the Court cites to the sealed documents it reviewed, where applicable, and has not included the parallel citation to the redacted version of the same document.  However, the Court notes for the public that any citation to a sealed document can be found at the same pages of the public, redacted versions of the briefs and exhibits.  The Court further notes that in an effort to preserve the confidentiality of the information that has been sealed, the Court discusses such information only in general terms.  The discussion of such information in that manner is not intended to imply that the Court did not examine the entire record before it.

ORDER
PAGE - 1

## II.    BACKGROUND

This matter arises out of a contract dispute between the parties.  Plaintiff Jet Parts Engineering, Inc. ("JPE") is a Washington corporation.  Dkt. #19 at ¶ 1.1.  JPE is engaged in the business of designing, manufacturing, distributing, and selling replacement jet parts.  Dkt. #19 at ¶ 1.1.  Defendant Quest Aviation Supply, Inc. ("Quest") is a California corporation previously engaged in the business of designing, manufacturing and selling replacement airplane parts.  *Id.* at ¶ 1.2.  Defendant Brent K. de Ruyter was the CEO and the sole shareholder of Quest.  *Id.* at ¶ 1.3.  JPE and Quest designed, manufactured, distributed, and sold replacement jet parts pursuant to Parts Manufacturer Approval ("PMA") from the Federal Aviation Administration ("FAA").  Dkts. #53 at ¶¶ 2 and 3 and #60 at ¶ 2.  The grant of PMA authority means that approved parts may be installed on commercial aircrafts as an equivalent alternative to corresponding original equipment manufacturer ("OEM") parts.  *Id.*

At the end of 2012 and beginning of 2013, JPE and Quest entered into negotiations for the sale of Quest to JPE.  Dkts. #60 at ¶ 5 and #53 at ¶¶ 6-10 and Exs. A-D thereto.  There were several offers from JPE; however, the final offer was to purchase Quest for $1.7 million and employ Mr. de Ruyter as a consultant for five months.  Dkt. #60 at ¶ 10 and Ex. D thereto.  Ultimately, the sale was not consummated.   Instead, JPE and Quest entered into two Distribution Agreements, which provided that JPE would attempt to sell Quest-manufactured parts to two airlines – Air France and Delta.  When those airlines chose to purchase such parts, Quest would provide them to JPE based on purchase orders from JPE to Quest.  Dkts. #60 at ¶¶ 5-8 and Exs. A and B thereto and #53 at ¶ 12 and Exs. E and F thereto.

In March 2014, Mr. de Ruyter received an unsolicited offer from HEICO, an aircraft parts supplier headquartered in Florida, to purchase Quest's assets.  Dkt. #53 at ¶ 13.  The offer

ORDER
PAGE - 2

was to purchase the assets for all cash, and was in an amount significantly higher than what had previously been offered by JPE. Dkt. #53 at ¶ 13. Quest informed JPE of the offer. Although JPE subsequently negotiated with Quest to purchase its assets, Quest ultimately accepted HEICO's offer. Dkts. #60 at ¶ ¶ 11-12 and #53 at ¶ 13. After the sale of the assets to HEICO, the proceeds were distributed to Quest's sole shareholder, Mr. de Ruyter. Dkt. #62, Exs. A at 15:11-15 and E. More specific facts surrounding this transaction and the claims resulting therefrom are further discussed below.

On April 3, 2015, JPE filed the instant lawsuit. Dkt. #1. JPE now alleges causes of action for breach of contract against both Quest and Mr. de Ruyter, unjust enrichment against both Quest and Mr. de Ruyter, and fraudulent transfer against Quest. Dkt. #29 at ¶ ¶ 4.1-4.40. Defendants have moved for summary judgment on all claims.

## III.   DISCUSSION

### A.  Standard of Review for Motions of Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (*citing Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)). Material facts are those which might affect the outcome of the suit under governing law. *Anderson,* 477 U.S. at 248.

The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However,

the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 251.

## B.  Applicable Law

The parties appear to agree that this matter is governed by Washington law.  Indeed, the Distribution Agreements at issue contain a governing law provision that provides for governance and construction of the Agreements under Washington law.  Dkts. #57-5 at ¶ 14.9 and #57-6 at ¶ 14.9.  Accordingly, the Court applies such law to the instant motion.

## C.  Breach of Contract Claims

Defendants first argue that Plaintiff cannot prove breach of contract against either Quest or Mr. de Ruyter.  Dkt. #52 at 10-18.  To prevail on a breach of contract claim under Washington law, a plaintiff must establish (1) the existence of a contractual duty, (2) defendant's breach of that duty, and that (3) defendant's breach of that duty caused damages to the plaintiff whom the duty is owed.  *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).  Plaintiff alleges that Defendants breached the Distribution Agreements in multiple ways (dkt. #29 at ¶ 4.5), addressed in turn below.

### 1.  Right of First Refusal

Plaintiff alleges that Quest breached the Distribution Agreements by failing to provide Plaintiff a good faith opportunity to match HEICO's bid or option to purchase Quest's assets.  Dkt. #29 at ¶ 4.5(c).  Section 13.2 of the Agreements reads:

> During the term of this Agreement, and for a period of six (6) months thereafter, in the event SUPPLIER decides to offer any of its assets, or stock

ORDER
PAGE - 4

for sale, SUPPLIER agrees to notify DISTRIBUTOR of such intent and
provides [sic] the DISTIRBUTOR with an opportunity to meet any other
potential buyer's terms and conditions.

Dkt. #57, Exs. E and F at ¶ 13.2.  Thus, the Agreements gave rise to a duty by Quest to inform
JPE of its intent to sell its assets and provide JPE with an opportunity to meet the potential
buyer's terms and conditions.

The parties agree that on March 28, 2014, Mr. de Ruyter notified Vice President and
Director of Operations of JPE, Nadim Fattaleh, of HEICO's offer.  Dkts. #53 at ¶ 13, Ex. H and
#60 at ¶ 11, Ex. D.   JPE acknowledges that such "notice was pursuant to § 13.2 of the
Distribution Agreements."  Dkt. #60 at ¶ 11.  Mr. Fattaleh thanked Mr. de Ruyter, and stated
that JPE was interested in the opportunity to meet the terms and conditions of the offer.  Dkt.
#60, Ex. D.  He asked for a copy of the offer from the other party, **"after redacting any
information you are not allowed to share with us,"** and Quest's most recent financial
statement.  *Id.* (emphasis added).  Quest provided a redacted version of the offer, which did not
reveal the identity of the proposed purchaser.  Dkt. #53, Ex. H.  The redacted version did
identify the following terms: proposed purchase price, escrow, inventory, representations and
warranties, indemnification (without identifying the proposed indemnitee), real estate (without
identifying the proposed purchaser), and expenses. [2]  *Id.*  Quest also provided its most recent
financial statement.  *Id.*  The "purchase price" term contained no redactions, and stated that
transaction structure would be a purchase of all assets for a cash amount (less escrow) on a debt
free basis.  *Id.*

On April 1, 2014, Mr. Fattaleh responded to Mr. de Ruyter, stating that the offer had
been redacted to the point where JPE was unable to fully evaluate it.  Dkt. #53, Ex. I.

---

[2]  The redacted terms included employee matters, approvals, post-closing transition, regulatory
requirements, acquiring entity, due diligence requirements, and contact person. Dkt. #53, Ex. J.

ORDER
PAGE - 5

Accordingly, Mr. Fattaleh asked for a copy of the agreement that essentially included every term and redacted only the Offeror's name. Dkt. #53, Ex. I. Mr. de Ruyter responded that the redacted offer represented the terms and conditions of the potential buyer, and that the redactions were only non-essential items that protected the anonymity of the buyer. *Id.* Mr. de Ruyter then stated that the Distribution Agreement did not obligate him to do anything more that provide the applicable terms and conditions, which he had done, and asked for a response from JPE. *Id.*

In response, JPE sent a Letter of Intent offering to acquire Quest for the same purchase price in cash. Dkt. #53, Ex. L. However, the offer was structured such that the purchase price would be paid in installments, with a sum certain up front, a sum certain at closing, and the balance to be paid in the form of earn out payments over the course of ten years. *Id.* The offer also included an option for the continued employment of Quest's President and CEO for five years, and other terms. *Id.* As noted above, Quest rejected JPE's offer.

JPE now essentially argues that Quest never provided it with a fair opportunity to meet the terms and conditions of HEICO's offer because it was only provided with a heavily redacted version of the offer, which prevented them from making a meaningful offer. Dkt. #69-1 at 18. JPE further asserts that Quest's actions are questions of material fact. *Id.* The Court disagrees.

With respect to materiality, the Court notes that "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Specifically, a "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit." *T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not

ORDER
PAGE - 6

preclude a grant of summary judgment." *Id.* Determining whether a "genuine" issue exists is often a close question. *Id.* The Court must consider the substantive evidentiary burden the nonmoving party must meet at trial – *e.g.* a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 252. No genuine issue for trial exists where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (*citing First Nat. Bank of Ariz. V. Cities Service Co.*, 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).

In this case, the duty set out in § 13.2 of the Distribution Agreements was that Quest was to provide notice of intent to sell its assets and provide an opportunity to JPE to meet the other potential buyer's terms and conditions. There is no dispute that Mr. de Ruyter provided such notice prior to the sale of its assets to HEICO. While JPE asserts that it could not make a meaningful offer because of the redactions to HEICO's offer, the record demonstrates that the material terms were conveyed, and that the redactions did not hide anything material to the purchase price or purchase structure. Moreover, JPE does not identify which redacted provisions, if any, would have meaningfully informed its offer had it known about such provisions at the time it made its offer. Thus, on this record, the Court agrees with Quest that undisputed evidence establishes that Quest satisfied the requirements of § 13.2, and no genuine issue exists for trial. Accordingly, the Court finds that the breach of contract claim based on an alleged breach of § 13.2 shall be dismissed.

2.  *Assignment of Distribution Agreements*

Plaintiff also alleges that Quest breached the Distribution Agreements by failing "to properly seek assignment of the Distribution Agreements and the sale of the substantial part of

its assets was to a competitor." Dkt. #29 at ¶ 4.5(d).  Section 14.2 of the Distribution

Agreements states:

> Assignment.  Neither this Agreement nor any right or obligation hereunder
> is assignable or transferable by either party in whole or in part without the
> prior written consent of the other party which shall not be unreasonably
> withheld, and any such purported assignment without such consent shall be
> void, except that either party shall have the right to assign this Agreement
> and its rights and obligations hereunder, without obtaining prior written
> consent of the other party, to any entity (other than a competitor of the other
> party hereto) with which the assigning party (a) merges, (b) sells a
> substantial part of its assets or businesses, or (c) sells a substantial part of its
> assets or business relating to the Products.

Dkt. #53, Exs. E and F at § 14.2.  Although not entirely clear, it appears Plaintiff argues that

Quest breached this provision when it sold its website (an asset) to HEICO, which was the

mode that JPE used to transmit purchase orders for parts to Quest, and then failed to fill a

purchase Order dated June 27, 2014.  Dkt. #69-1 at 13-14.  Plaintiff asserts that Quest either

assigned its obligation to fill purchase orders to HEICO without JPE's consent, which would be

a breach of § 14.2, or it breached the Distribution Agreement by failing to fulfill its own

obligation with respect to the purchase Order.  *Id.* at 13-16.

    As an initial matter, the Court notes that § 14.2 creates one duty – that Quest seek

consent from JPE before assigning the Agreement or any right or obligation thereunder.  The

remainder of the section sets forth the consequences of any assignment without seeking

consent, and certain circumstances where assignment could occur without consent (which are

not applicable in this case).  The parties agree that the Agreements themselves were never

assigned to HEICO.  Indeed, Plaintiff alleges as much in its Complaint.  Dkt. #29 at ¶ 3.12.

Plaintiff also agrees that Quest made an offer to assign the Agreements to HEICO, but that

Plaintiff rejected the offer.  *Id.*  Thus, there can be no breach of § 14.2 on the basis that the

Agreements themselves were not assigned to HEICO.

ORDER
PAGE - 8

However, § 14.2 also requires that Quest seek consent before assigning any right or obligation under the Agreements.  JPE argues that a pending purchase order was not fulfilled because HEICO had no obligation to fill it, and Quest made no other provision for its obligations after it sold its assets.  Dkt. #69-1 at 14-15.  Quest responds that JPE failed to submit the purchase Order to Quest as required, and therefore it cannot hold Quest liable for any breach. Dkt. #72 at 6-7.  The Court agrees with Quest.

The Air France Agreement, which is the Agreement related to the purchase Order in question, required JPE to submit purchase orders to Quest.  Dkt. #53, Ex. E at § 3.  Those purchase orders were submitted through Quest's website.  Dkt. #53 at ¶ 45.  HEICO took control of the website on June 14, 2014, after the asset transaction closed.  *Id.*  The purchase order, dated June 23, 2014, was submitted to the website after HEICO took control of that asset.  *Id.*at ¶ ¶ 44-45 and Ex. P thereto.  Despite the fact that JPE knew the date of the asset sale, had not consented to the assignment of the Agreements to HEICO, and had contact information for Mr. de Ruyter, JPE did not address the purchase order with Mr. de Ruyter (Quest).  Instead, JPE addressed the purchase order with HEICO for several weeks.  *Id.* at ¶ 46 and Ex. Q thereto.  Ultimately, JPE told HEICO that it had been instructed by its attorney to hold off on fulfilling the purchase order.  *Id.*

Under these facts, the Court finds no breach of § 14.2.  While JPE argues that a question of fact remains as to whether Quest could have fulfilled the purchase order, that argument is of no import because JPE does not dispute that it never directed the purchase order to Quest.  If it had, and Quest did not fulfill the order, that may have left JPE in a different position now.  But that is not what occurred.  JPE's own actions left Quest with no knowledge of the purchase

order or opportunity to fill it.  Thus, Quest's duty to fulfill the purchase order never arose, and it cannot be liable for breach of contract.

Further, even if JPE could demonstrate that the duty arose and Quest breached the duty, JPE cannot demonstrate that Quest's alleged breach damaged JPE.  The record is clear that JPE informed HEICO it would not be resubmitting a purchase order for the single part requested by Air France, because it was instructed by its attorney to do so.  Dkt. #53 at ¶ 46 and Ex. Q thereto.  Thus, any damages resulted from JPE's own actions as well.  For all of these reasons, the Court denies any breach of contract claims based on § 14.2 and/or Quest's alleged failure to fulfill a purchase order.

### 3. Technical Support

Finally, Defendant seeks dismissal of any alleged breach of § 5.1   JPE alleges that Quest breached the Distribution Agreements by failing to provide engineering support and cooperate in obtaining approval of parts for Delta Airlines. Dkt. #29 at ¶ 4.5(b).  Specifically, JPE argues that Defendants failed to provide technical support as was required by § 5.1 of the Distribution Agreement.  Dkt. #69-1 at 16-17.

Section 5.1 of the Agreements provides:

> Technical Support:   SUPPLIER shall provide technical support to DISTRIBUTOR's sales personnel and customers, and promptly provide to DISTRIBUTOR such additional technical information developed or acquired by SUPPLIER from time to time as may reasonably be expected of assistance to DISTRIBUTOR in fulfilling its obligation hereunder.
>
> SUPPLIER shall provide an information pack to support DISTRIBUTOR with Exclusive Customers' decision making for all Products.  SUPPLIER gives DISTRIBUTOR full permission to disclose any and all technical documentation, drawings analysis or other information to the Exclusive Customers for the purpose of obtaining technical approval or for any reasons including but not limited to reasons associated with Continued Operational Safety.  The information shall include, but not be limited to:
>> 5.1.1    All testing analysis

ORDER
PAGE - 10

|       |                                                    |
|-------|----------------------------------------------------|
| 5.1.2. | PMA supplement                                    |
| 5.1.3. | Sample 8130 form                                  |
| 5.1.4. | Drawing                                           |
| 5.1.5. | Sample Parts                                      |
| 5.1.6. | Lead times                                        |
| 5.1.7. | Reliability details and warranty details.         |

Dkt. #53, Exs. E and F at § 5.1.

In late 2013, JPE advised Mr. de Ruter about a potential opportunity to sell Quest parts (seals to be installed on thrust reversers on MD-90 aircraft) to Delta. Dkt. #53 at ¶ 51. At JPE's request, Quest prepared eight Basic Engineering Review Packages ("BERPs") addressing 15 Quest part numbers. *Id.* The BERPs were provided to JPE, which then transmitted them for review by Delta's engineering personnel. The BERPs are very large data files, containing detailed technical information about the parts' designs and their approval by the FAA as PMA parts. *Id.* The BERPs were submitted to Delta on a rolling basis in or about December 2013 and January 2014.

On May 7, 2014, JPE advised Quest that Delta had rejected Quest's parts. Dkt. #53, Ex. R. The email provided reasons for the rejection, including that Quest would be a new vendor and that the parts offered were simply too different from the OEM parts. *Id.* JPE asked Quest to come up with "a game plan." *Id.* On May 13, 2014, Mr. de Ruyter participated in a phone call with JPE and Delta, wherein he was told that the reason the parts were being rejected was because they were too different. Dkt. #53 at ¶ 54. Mr. de Ruyter offered to travel to Atlanta to meet with Delta engineering personnel. *Id.* at ¶ 55. No meeting was ever arranged.

Between May 20th and May 27th, JPE and Quest continued to discuss the rejection of the Quest parts. Dkt. #61, Ex. A. After a phone call between Mr. Goel and Mr. de Ruyter, Mr. Goel emailed Mr. de Ruyter asking him to "send me email as we discussed. I need it before I send steve [sic] out to fight battle." *Id.* JPE asserts that Mr. de Ruyter never did respond as

requested.  Dkt. #61 at ¶ 2.  Quest does not address this assertion in its briefing.   The Court

agrees with Plaintiff that this email exchange raises a genuine dispute as to a material fact.  It is

not clear based on this exchange whether Quest provided the technical support that it was

required to provide under the Distribution Agreements.   Accordingly, the Court will not

dismiss Plaintiff's breach of contract claim alleging a breach of § 5.1.

### 4.   Breach of Contract Claim Against Mr. de Ruyter/Alter Ego Doctrine

Plaintiff has also alleged a breach of contract claim against Mr. de Ruyter individually.

Dkt. #29 at ¶¶ 4.7-4.18.  Although styled as a breach of contract claim, it appears that Plaintiff

really seeks to hold Mr. de Ruyter personally liable for any Quest breach under the alter ago

doctrine.  *See id.* and Dkt. #69-1 at 22-23.  As this Court has previously held, Plaintiff's breach

of contract claim is dismissed to the extent that it can be read to assert a breach claim against

Mr. de Ruyter.  Dkt. #28 at 4-5.  This Court has also previously explained, a "'request to pierce

the corporate veil is only a means of imposing liability for an underlying cause of action and is

not a cause of action in and of itself.'"  *Id.* at 5 (quoting *Local 159, 342, 343 & 444 v. Nor-Cal*

*Plumbing, Inc.*, 185 F.3d 978, 985 (9th Cir. 1999)).

Washington recognizes the "alter ego" doctrine, which provides, "'Where a private

person so dominates and controls a corporation that such corporation is his *alter ego*, a court is

justified in piercing the veil of corporate entity and holding that the corporation and private

person are one and the same.'"  *Standard Fire Ins. Co. v. Blakeslee*, 54 Wn. App. 1, 5, 771 P.2d

1172 (1989) (quoting *Pohlman Inv. Co. v. Va. City Gold Mining Co.*, 184 Wash. 273, 283, 51

P.2d 363 (1935)).  Under Washington law, "[t]he corporate entity is disregarded and liability

assessed against shareholders in the corporation when the corporation has been intentionally

used to violate or evade a duty owed to another."  *Morgan v. Burks,* 93 Wash. 2d 580, 585, 611

ORDER
PAGE - 12

P.2d 751 (1980) (citation omitted).  Both of the following elements must be proved before the corporate entity will be disregarded:

1. That there is such a commingling of property rights or interest as to render it apparent that the corporation and some other entity were intended to function as one;

2. That to regard the corporation and the other entity as separate would aid the consummation of a fraud or wrong upon others.

Thomas V. Harris, *Washington's Doctrine of Corporate Disregard,* 56 Wash. L. Rev. 253, 258 (1981) (citing *Morgan,* 93 Wash. 2d at 587-88).

"The first element requires the court to determine whether the shareholders abused the corporate form," while "[i]n considering [the] second requirement, the court must determine, in each particular case, if any of the wrongful corporate activities actually harmed the party seeking relief."  Harris, *supra.*  "'Mere common ownership of stock, the same officers, employees, etc., does not justify disregarding the separate corporate identities unless a fraud is being worked upon a third person.'"  *Minton v. Ralston Purina, Co.*, 146 Wn.2d 385, 399, 47 P.3d 556 (2002) (quoting *Rena-Ware Distributors, Inc. v. State*, 77 Wn.2d 514, 518, 463 P.2d 622 (1970)).

In the instant matter, JPE fails to present any evidence to support the first element required to raise an issue of fact as to commingling.  Indeed, JPE fails to address that element at all in its Response.  *See* Dkt. #69-1 at 20-22.  Further, while JPE asserts that Mr. de Ruyter "was Quest" and ignored the corporate form when HEICO paid him directly for the sale of Quest's assets, JPE ignores the fact that the asset sale and distribution were reflected in Quests

ORDER
PAGE - 13

accounting.  Dkt. #62, Ex. A at 15:20-16:6.  Accordingly, the Court will dismiss any breach of

contract claim pertaining to Mr. de Ruyter under the theory of alter ego liability.

     *5.  Limitation on Damages*

     Defendants ask this Court to limit damages should any of Plaintiff's breach of contract

claims survive this motion.  Dkt. #52 at 18.  Defendants rely on § 9.1 of the Distribution

Agreements, which reads:

> Procedures:  On the termination of this Agreement, except for cause
> pursuant to Section 8.20, SUPPLIER shall continue to honor
> DISTRIBUTOR's orders for Products up to the effective date of
> termination and for a period of sixty (60) days thereafter, and
> DISTRIBUTOR shall pay for all such Products on the terms and conditions
> of this Agreement.

Dkt. #53, Exs. E and F at § 9.1.[3]  Defendants argue that because the Agreements were

terminated for cause under Section 8.2, its duties ended at the time specified in Section 9.1.

Dkt. #52 at 18.  According to Defendants, any damages would therefore be limited to contract

damages based on hypothetical sales occurring prior to September 8, 2014, which is the date of

the liquidation of Quest's assets and the effective termination of the Distribution Agreements.

*Id.*  JPE argues that Section 9.1 does not apply at all if Section 8.2 is invoked.  Dkt. #69-1 at 14.

     The Court agrees with Plaintiff that Section 9.1 is inapplicable due to Defendants'

termination of the Agreements for cause.  Indeed, Defendants themselves note that all Section

9.1 provides is that Defendants would continue to honor purchase orders for 60 days after

termination if Defendants had not terminated for cause.  Dkt. #72 at 9.  However, the Court

also agrees with Defendants that its duties terminated as of September 8, 2014, because that is

the date the Agreements effectively terminated, and no duty to fulfill orders received after that

---

[3]  The parties appear to agree that the reference to Section 8.20 is a typographical error, as no
such paragraph exists in the Agreements, and instead should be read as a reference to Paragraph
8.2 entitled "Termination."

ORDER
PAGE - 14

date existed.  Accordingly, Defendants can have no liability for damages tied to hypothetical purchase orders after that date.

**D.  Unjust Enrichment**

Defendants next move for the dismissal of Plaintiff's unjust enrichment claim.  Dkt. #52 at 18-19.  Under Washington law, "[u]njust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it."  *Young v. Young*, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008).  Where a valid contract governs the rights and obligations of the parties, unjust enrichment does not apply. *See Mastaba, Inc. v. Lamb Weston Sales, Inc.*, 23 F. Supp. 3d 1283, 1295-96 (E.D. Wash. 2014).  In this case, no one disputes that Quest and JPE entered into valid Distribution Agreements.  Consequently, JPE has an adequate legal remedy for breach of contract against Quest.  Whether or not it can prove its breach of contract claim is a different question, but that does not permit it to raise unjust enrichment with respect to Quest.

Plaintiff responds that its unjust enrichment claim should be presented to the jury as to Mr. de Ruyter as an alternative to the alter ego theory of liability.  Dkt. #69-1 at 22.  The Court disagrees.  The alter ago theory of liability is rooted in a breach of contract claim against Quest. Therefore, unjust enrichment does not apply.

**E.  Fraudulent Transfer**

Finally, Defendant seeks the dismissal of Plaintiff's fraudulent transfer claim.  Dkt. #52 at 22-24.  JPE alleges that Quest transferred the proceeds of the sale of its assets to Mr. de Ruyter with the actual intent to hinder, delay, or defraud its creditor JPE in violation of RCW 19.40.041.  Dkt. #29 at 4.37.

Under RCW 19.40.041(a), a transfer made by a debtor is fraudulent to a creditor, if the property was transferred "(1) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." RCW 19.40.041(a). A fraudulent transfer occurs where "one entity transfers an asset to another entity, with the effect of placing the asset out of the reach of a creditor, with either the intent to delay or hinder the creditor or with the effect of insolvency on the part of the transferring entity." *Thompson v. Hanson*, 168 Wn.2d 738, 744, 239 P.3d 537 (2009). Any party making a claim under the UFTA carries the burden of proving that the transfer in question was fraudulent. *Sedwick v. Gwinn*, 73 Wn. App. 879, 885, 873 P.2d 528 (1994). Proof of actual intent to defraud must be clear and satisfactory. *Clearwater v. Skyline Const. Co., Inc.*, 67 Wn. App. 305, 321, 835 P.2d 257 (1992).

Defendants argue that this claim fails for several reasons. First, Defendants assert that Quest is not a "debtor" and JPE is not a "creditor" for purposes of the statute. "'Creditor'" means a person who has a claim." RCW 19.40.011(4). "'Debtor' means a person who is liable on a claim." RCW 19.40.011(6). "'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." RCW 19.40.011(3). The statute provides that a fraudulent transfer can occur "whether the creditor's claim **arose before or after** the transfer was made or the obligation was incurred." RCW 19.40.041 (emphasis

ORDER
PAGE - 16

added).  "Thus, under the definitions provided in the UFTA, a creditor need only have a right to collect a payment to void a fraudulent transfer."  *Douglas v. Hill*, 148 Wn. App. 760. 765, 199 P.3d 493, 496 (2009).  In this case, the Court has determined that at least one claim of breach survives summary judgment, and, should JPE be successful on that claim, it would be considered a creditor for purposes of the statute.  Accordingly, the Court finds material questions are present as to whether the parties constitute a debtor and creditor.

Quest next argues that there is no evidence in the record that it distributed assets with the actual intent to defraud JPE.  Dkt. #52 at 22-24.  RCW 19.40.041(b) provides:

> (b) In determining actual intent under subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>
> (1) The transfer or obligation was to an insider;
>
> (2) The debtor retained possession or control of the property transferred after the transfer;
>
> (3) The transfer or obligation was disclosed or concealed;
>
> (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) The transfer was of substantially all the debtor's assets;
>
> (6) The debtor absconded;
>
> (7) The debtor removed or concealed assets;
>
> (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

ORDER
PAGE - 17

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

RCW 19.40.041(b).  JPE argues that five of these factors can be answered affirmatively.  Dkt. #69-1 at 23.

The Court finds that on this record, questions of fact for the fact finder as to intent exist. Quest argues that the factors presented by JPE can easily be explained.  Dkts. #52 at 22-24 and #72 at 12.  However, that is a question for the fact finder.  Accordingly, the Court finds that it would be premature to dismiss Plaintiff's fraudulent transfer claim.

## IV.    CONCLUSION

Having reviewed the relevant pleadings, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby ORDERS:

1.  Defendants' Motion for Summary Judgment (Dkt. #52) is GRANTED IN PART AND DENIED IN PART as discussed above.

2.  The only surviving claims for trial in this matter are: (a) breach of contract on the basis that Quest breached § 5.1 of the Distribution Agreements; and (b) fraudulent transfer.

3.  The Court will address the pending motions in limine in due course.


DATED this 23rd day of March 2017.



RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER
PAGE - 18